**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALICIA MORGAN, | |
| *Plaintiff*, | No. 3:17-cv-2091 (MPS) |
| v. | |
| DEPARTMENT OF MOTOR VEHICLES, | |
| *Defendant*. | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Alicia Morgan filed this action against the State of Connecticut Department of Motor Vehicles ("DMV"), alleging that she was retaliated against "for having opposed and complained about racial discrimination," ECF No. 21 at 5, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*[1] The DMV moved for summary judgment on this claim "because the plaintiff cannot establish that she was terminated as [a] result of filing her CHRO complaint." ECF No. 43-1 at 1. Morgan filed two opposition briefs, ECF Nos. 46, 50, and the DMV filed a reply brief, ECF No. 52.[2] Because I conclude that no reasonable juror could find that the DMV terminated

---

[1] Morgan's operative complaint, ECF No. 21, also alleged a hostile work environment based on her race, but I dismissed that claim under Rule 12(b)(6) in an earlier ruling, ECF No. 38. I also ruled that Morgan had abandoned any other employment discrimination claim in her Amended Complaint since she "fail[ed] to address the DMV's arguments for dismissal of such a claim," ECF No. 38 at 5 n.1, and in fact stated that she was not raising a discrete discrimination claim, *see* ECF No. 34 at 4 (Morgan's opposition brief to the DMV's motion to dismiss disclaiming any racial discrimination claim apart from her hostile work environment claim).

[2] The DMV sought permission to file a reply brief in excess of the 10-page limitation set forth in Local Rule 7(d). ECF No. 51 at 1. I grant that motion, since Morgan filed two opposition briefs that introduced new arguments—such as the claim that Lt. Green testified at Morgan's "disciplinary hearing"—for the first time. *See* ECF No. 52 at 4–6.

Morgan from her employment on account of her filing a CHRO complaint protesting racial discrimination, I grant the DMV's motion.

## I.  FACTS

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated. There are very few disputed facts in this case.

In February 2013, Alicia Morgan began working as a Motor Vehicle Inspector for the DMV Commercial Vehicle Safety Division ("CVSD"). Def. L.R. 56(a)(1) Stmt. ("Def. Stmt."), ECF No. 43-2 ¶ 1, 3. As a Motor Vehicle Inspector, she was a "POST certified" (Police Officers Standards and Training) law enforcement officer with powers of arrest. *Id.* ¶ 2. Inspectors' law enforcement functions included: "truck safety and size/weight enforcement; school bus inspections and enforcement; licensing of repairers and dealers of new and used vehicles; vehicle identification and auto theft investigation; registration enforcement; and[] speed and traffic law enforcement." *Id.* Morgan's duties specifically included truck inspections, she carried a loaded weapon, and she had the authority to make arrests and conduct traffic stops. *Id.* ¶ 5.

### A.  **February 2016 Firearms Training**

On February 23, 2016, Morgan participated in a firearms simulation training on the use of force. *Id.* ¶ 6. Morgan had received the DMV's "Firearms and Use of Force Policy, General Order F-1" in 2013, and she "was required to sign-off that she had reviewed the policy every year thereafter." *Id.* ¶ 9. That policy states that the "use of deadly force is authorized only when the inspector reasonably believes that the action is in defense of human life, including the inspector's life, or in defense of any person in imminent danger of serious physical injury or death." *Id.* ¶ 10.

In one of the training exercises on February 23, 2016, an inspector portrayed a truck driver as an "old man carrying a walking stick." *Id.* ¶¶ 11, 13. The inspector "exited the truck and confronted the plaintiff, the plaintiff drew her [simulated] weapon," the inspector "did not comply with the plaintiff's commands to stop walking toward her," and "[t]he plaintiff used deadly force, firing her [simulated] weapon hitting [the inspector with simulated ammunition.]" *Id.* ¶ 13.

After the exercise, Inspector Poist, one of the instructors, "informed CVSD Division Manager and Chief Firearms Instructor, Lieutenant Christopher Smith, of concerns regarding the plaintiff's use of deadly force and her attitude during the training." *Id.* ¶ 15. Each of the three instructors who conducted the exercise was directed to provide a written memorandum regarding the training exercise to Lt. Smith. *Id.* ¶ 16. The DMV contends that instructors raised concerns about Morgan's "improper use of deadly force" as well as "comments by [Morgan] that she did not know why this type of training was necessary; she was just going to shoot; and, she would take her chances in court regarding her decision to use deadly force." *Id.* ¶ 17; *see* ECF No. 43-6 at 29–30 (memorandum from Inspector Poist, stating that Morgan said that she "did not know why [the training] was necessary," that she "didn't care" about her decision to fire her simulated weapon, that she would "take her chances in court if it ever happened in real life," and that "because of her small stature, she would resort to her firearm & use deadly force rather than risk being injured," and opining that Morgan's actions were "unwarranted & inappropriate"); ECF No. 43-6 at 31 (memorandum from Inspector Bajek, stating that Morgan remarked during the exercise, "I don't like this stuff. I'm just going to shoot you," that she said after she fired her simulation weapon, "she would take her chances in court in a situation like that," and that she "said something to the effect that based on her size versus my size and that I had a stick in my hand, she felt that shooting was proper"); ECF No. 43-6 at 32–33 (memorandum from Inspector Vernali, stating that Morgan

said "she didn't want to do this [training] and that she hates these types of training exercises," and that she remarked after firing her simulated weapon that she "didn't care, that she'd take her chances in court if something like that ever happened to her for real," and noting that "she left me with the feeling that she just didn't care . . . what we had to say").

Morgan presents a different version of the February 23 training. She avers that "[t]here was no indication that I had not properly completed the training. In any way," and that the "three trainer reports were false." ECF No. 43-5 at 6. She also contends that Inspector Vernali told her, when debriefing the training, "there is no right or wrong response here," and that "none of the three instructors present expressed any concerns about the choice [she] made," "gave [her] any advice to the contrary," or "communicated that there were issues of concern." ECF No. 43-6 at 35. She claims that she "presented no attitude [at the training] outside of being cooperative and completing the simulation to the best of [her] ability." *Id.*

After receiving memoranda from the instructors and from Morgan, Lt. Smith informed Lieutenant Garfield Green, CVSD Training Officer, of the incident. Def. Stmt., ECF No. 43-2 ¶ 20. Lt. Green scheduled Morgan for "remedial training" on March 14, 2016, which she completed "satisfactorily." *Id.* ¶¶ 21–22. At her remedial training and at an April 8, 2016 meeting, Morgan denied making the comments her instructors alleged. *Id.* ¶¶ 23–25. Morgan also alleges that "subjecting her to the April, 2016 meeting was contrary to established DMV practice based on what other Inspectors told her." *Id.* ¶ 27. After the April 8 meeting, CVSD referred the matter to DMV Human Resources. *Id.* ¶ 26.

### B. June 21, 2016 Pursuit

DMV's Pursuit Policy accords with the Uniform Statewide Pursuit Policy and authorizes pursuit only in "cases of the actual occurrence or threat of serious injury or death to a human

4

being." *Id.* ¶¶ 32–33. Upon engaging in a pursuit, "the inspector shall immediately alert the troop of the location, direction, traffic conditions, speed of the pursuit, the description of the pursued vehicle and the initial reason for the pursuit. . . . The pursuing inspector shall keep the [CVSD] supervisor and troop continuously updated on the pursuit." *Id.* ¶ 34. Morgan was aware of this Pursuit Policy and "had received annual review training on the policy in June 2014 and July 2015." *Id.* ¶ 31.

On June 21, 2016, at approximately 5:30 AM, Morgan "engaged in a vehicular pursuit on I-84 Eastbound between Exits 62/63 and 71." *Id.* ¶ 28. It was "slightly dark out, road conditions were slightly wet[,] and there were other motorists on the road." *Id.* ¶ 29. Morgan did not immediately call in to the State Police Troop upon engaging in the pursuit; rather, she called a coworker, Inspector Browne, "prior to Exit 68." *Id.* ¶¶ 36–37. Morgan then called Troop C and was in the process of calling when the vehicle exited the highway at Exit 71. *Id.* ¶ 38. Morgan's supervisor, Sergeant Rosario, called CVSD Lieutenant Donald Bridge, Jr. at approximately 6:30 AM regarding the pursuit, and Lt. Bridge thereafter initiated a CVSD investigation. *Id.* ¶¶ 42–43. Lt. Bridge directed Sergeant Rosario to obtain a memorandum from Morgan and to provide a case incident report "as to his involvement." *Id.* ¶ 43. Lt. Bridge also requested audio transmissions of the pursuit from the State Police. *Id.* He determined that "the pursuit covered at least 16 miles and lasted more than 10 minutes with speeds ranging from 80-120 mph. *Id.* ¶ 44. The CVSD investigation found that Morgan "failed to adhere to DMV's Pursuit Policy" by "fail[ing] to immediately notify State Police Troop H upon initiating the pursuit," and by "fail[ing] to adhere to General Order S-5, Speed Detection Devices, in attempting to initiate a traffic stop prior to engaging in the pursuit without having a current speedometer calibration sheet in her vehicle." *Id.*

¶¶ 45–47. Morgan "admits that she violated the Pursuit Policy." *Id.* ¶ 39. Lt. Bridge forwarded the documentation related to the investigation to DMV Human Resources on July 15, 2016. *Id.* ¶ 49.

### C. <u>Other Vehicle Pursuits by DMV Officers</u>

#### 1. *November 27, 2012 Pursuit by Lt. Bridge*

On November 27, 2012. Lt. Bridge received a call on a two-way radio from Troop H requesting "all marked units in the area" because "shots had been fired at an officer from a suspect attempting to flee." *Id.* ¶ 53. Lt. Bridge responded to Troop H, "advising of his location," Troop H "acknowledged his response," and he "activated his emergency lights and sirens and engaged in a pursuit of approximately 2.75 miles with three unmarked undercover police vehicles." *Id.* ¶ 54. After this pursuit, Division Chief Rio "reviewed Lt. Bridge's pursuit and determined that the pursuit was technically a violation of DMV's no pursuit policy [in place at the time]," but Lt. Bridge was given no discipline. *Id.* ¶ 56. Rio avers that he "determined that it was an appropriate violation based on the exigent circumstances" and "further determined that Lieutenant Bridge engaged in the pursuit with the acknowledgement of the State Police." Rio Aff., ECF No. 43-9 ¶¶ 13–14. After Lt. Bridge's November 2012 pursuit, the DMV changed its no-pursuit policy and adopted its current policy in June 2014, in accordance with the Uniform Statewide Pursuit Policy. *Id.* ¶ 16; Def. Stmt., ECF No. 43-2 ¶ 57.

#### 2. *May 6, 2015 Pursuit by Inspector Melendez*

On May 6, 2015, the State Police issued an alert that "the East Hartford Police Department was in pursuit of a suspect who had dragged one of its officers." Def. Stmt., ECF No. 43-2 ¶ 59. Inspector Melendez engaged in the pursuit, and was "in constant communication with Troop H as to his location, location of the suspect[,] and speed." *Id.* Chief Rio reviewed the pursuit, determined that "Inspector Melendez had adhered to the Pursuit Policy" dated June 2014, determined that he

"appropriately engaged in the pursuit based on the exigent circumstances . . . and maintained constant communication with the State Police during the pursuit," and took no further action. *Id.* ¶ 60–63.

**D. July 26, 2016 Traffic Stop**

On July 26, 2019, Morgan stopped a vehicle for speeding on I-91. Both the motorist and his passenger were African-American, as is Morgan. *Id.* ¶ 71; Am. Compl., ECF No. 21 at 1. In her memorandum regarding the incident, Morgan wrote that she told the motorist that she stopped him for speeding, and went back to her car "to complete the stop." ECF No. 43-7 at 26 (July 26, 2016 memorandum from Morgan). As she was in her car "running the information," the motorist exited his vehicle. *Id.* Morgan told him to "get back in [his] vehicle," but he "kept coming and yelled 'hurry up, I have to pick up my niece.'" *Id.* Morgan told him again to get back in his vehicle. As she "continued to complete [the] stop," the motorist "stepped out of his vehicle again – yelling 'hurry up, I gotta go.'" *Id.* Morgan again told him to "get back in his vehicle," but the motorist yelled that Morgan should go attend to a broken-down vehicle elsewhere on the highway, and he and his passenger "kept honking their horn." *Id.* Morgan "finished [] inputting the information," printed the ticket, and approached the vehicle, where the occupants had the windows all the way up and were "spouting expletives off at [her]." *Id.* Morgan said, "This is why you people get in trouble," and "threw the ticket through what opening there was in the window." *Id.* Morgan "admits that the motorist and passenger took her statement to have a racial meaning." Def. Stmt., ECF No. 43-2 ¶ 72. The occupants "began yelling expletives" and "both got out of the car and came towards [Morgan]." ECF No. 43-7 at 26. She "backed up" towards her car, the occupants continued yelling at her, Morgan requested back-up, and Troopers from Troop H arrived at the scene. *Id.*; Def. Stmt., ECF No. 43-2 ¶ 65–66.

The following day, on July 27, Lt. Bridge received a call regarding a complaint by the motorist and passenger whom Morgan had stopped. *Id.* ¶ 67. Lt. Bridge initiated an internal CVSD investigation, notified Lt. Smith of the incident, and obtained Morgan's memoranda to the State Police. *Id.* ¶¶ 68–69.

**E.  Administrative Leave and Termination**

On July 27, 2016, after learning of the traffic stop incident, the DMV Director of Human Resources, Daniel Callahan, met with Chief Rio and Lt. Smith regarding "all three incidents involving the plaintiff." *Id.* ¶ 73. Callahan decided to place Morgan on "administrative leave with pay pending the on-going investigation into the Firearms training and the pursuit as well as investigation into the traffic stop." *Id.* ¶ 74. As part of its investigation, DMV Human Resources held a "fact-finding hearing on September 16, 2016, at which the plaintiff was asked questions about the three incidents with her union steward present." *Id.* ¶ 79. While Morgan claims in her opposition brief that Lt. Green testified at a "disciplinary hearing" in September 2016, ECF No. 46 at 1, Callahan avers that the September 16 hearing "was the only hearing held at DMV related to the plaintiff's termination," and that Lt. Green "was not involved in the investigation" or the "fact-finding hearing held on September 16." Callahan Supp. Aff., ECF No. 52-1 at 3 (stating that "[t]he only hearings that Lieutenant Green testified at related to the plaintiff were the unemployment benefits compensation hearing on August 15, 2017 and the arbitration hearing on September 12, 2018"); ECF No. 52-1 at 24–29 (transcript of Lt. Green's testimony at a "hearing . . . to determine . . . eligibility for unemployment benefits for . . . Alicia Morgan").

On September 19, 2016, Morgan filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO). *Id.* ¶ 80. The DMV was "timely notified of that complaint and filed a written response to it on November 14, 2016." Amended Complaint, ECF

No. 21 at 8; Answer, ECF No. 39 at 2. Morgan testified that "no one at DMV ever said anything to her about having filed her CHRO complaint." Def. Stmt., ECF No. 43-2 ¶ 90.

DMV Human Resources completed its investigation on March 9, 2017. *Id.* ¶ 81. A memorandum summarizing the findings of the investigation states that Morgan:

(a) "[U]tilized poor judg[]ment in the comments that she made during the training. These comments were unprofessional and inappropriate in nature given the fact s[h]e made them after choosing to utilize deadly force in the training." ECF No. 43-8 at 12.

(b) "[F]ailed to follow General Order #P-3 Pursuit," "failed to follow her Sergeant's clear instructions to 'Read the Pursuit Policy,'" "failed to follow General Order #S-5 Speed Detection Devices," and "exercised extremely poor judg[]ment in engaging in this pursuit." ECF No. 43-8 at 11.

(c) "[U]sed poor judg[]ment in handling the motorist by what she said and throwing the ticket in the window." ECF No. 43-8 at 9.

In an April 7, 2017 letter, the DMV notified Morgan "that you are being dismissed from state service for just cause effective April 20, 2017, based on your violations of agency policies and extremely poor judgment that occurred in three separate incidents." ECF No. 43-8 at 76 (citing concerns regarding the training exercise, the vehicle pursuit, and the traffic stop).

Callahan states in his affidavit that Morgan had unemployment benefits compensation hearings on July 11, 2017 and August 15, 2017, in addition to other arbitration, grievance, and CHRO hearings from May 2017 through April 2019. Callahan Supp. Aff., ECF No. 52-1 at 2–3. Lieutenant Green testified at the August 2017 unemployment compensation hearing. Def. Stmt., ECF No. 43-2 ¶ 86; ECF No. 52-1 at 24–29.

## F.  **Lt. Green Affidavit**

Morgan submitted only one exhibit with her first opposition brief: an affidavit from DMV Lieutenant Garfield Green, dated April 2, 2019.[3] The affidavit states that, from 2012 until his retirement on April 1, 2019, Lt. Green was "responsible for all matters regarding the training of our officers," "supervised all personnel in the training division," and served as "the liaison between the [DMV] and the Connecticut Police Academy." ECF No. 46-2 ¶ 1–2. It further avers that he is "personally familiar with the disciplinary proceedings brought against Officer Alicia Morgan." *Id.* ¶ 3. Specifically, he "personally examined Officer Morgan" regarding the "matter which arose during her [firearms] training," and "determined that there was no irregularity in the manner in which she handled that issue." *Id.* ¶ 4. Regarding the other two incidents, Lt. Green avers that he "determined that [Morgan] had indeed violated [the vehicle pursuit] policy," and that he "examined all the details of [the traffic stop] incident and determined that she did nothing wrong." *Id.*

The affidavit also states that Lt. Green is "personally aware of a white male officer who violated [the vehicle pursuit] policy and, after an investigation determined that he had violated the policy, he received no discipline whatsoever." *Id.* ¶ 5. Lt. Green attests that Morgan "is the only person ever terminated from a position as a sworn officer with the [DMV] for the sort of offenses that were charged against her." *Id.* ¶ 6. Finally, "[b]ased on [his] personal familiarity with the facts and circumstances of Officer Morgan's case and other comparable matters in the department," Lt. Green opines that she was "subjected to disparate treatment based on her race, color and gender." *Id.* ¶ 7.

---

[3] The DMV objects to Lt. Green's affidavit, arguing that it "is not admissible and cannot be considered on summary judgment." ECF No. 52 at 8. I address this argument in Section III.B.1, below.

### G. **Arbitration Ruling**

Morgan filed a "supplemental" opposition brief, also attaching only one exhibit: a June 26, 2019 arbitration decision resulting from the grievance proceeding her union brought on her behalf. ECF No. 50-1. The arbitrator addressed the issue whether "the discipline of Alicia Morgan, as set forth in the April 7, 2017 letter of discipline, [was] for just cause." *Id.* at 1. The decision examines the facts, relevant polices, and the parties' positions related to each of the three incidents, and ultimately finds in favor of Morgan: "If none of the three incidents alone warranted discipline at the time, I cannot find that they warrant termination when combined months after they occurred." *Id.* at 23. Concluding that "the State has not met its just cause burden," the arbitrator ordered that "the grievant shall be made whole for back pay, less interim outside earnings, and lost benefits in accordance with the [collective bargaining agreement] between the parties." *Id.* at 28.

## II.     **LEGAL STANDARD**

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of

a genuine dispute of material fact." *Id.* In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

## III.    DISCUSSION

Title VII contains an antiretaliation provision making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. §2000e-3(a). "Title VII thus prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).

The three-step burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to Title VII retaliation cases. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Under that framework, first, the plaintiff must establish a prima facie case of retaliation by showing (1) that she participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that she suffered an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action. *Id.* at 164; *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013). Second, if the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Third, if the defendant does so, the plaintiff must "demonstrate that the proffered reason is pretext for

retaliation and that the plaintiff's 'protected activity was a but-for cause of the alleged adverse action by the employer.'" *Kleehammer v. Monroe Cty.*, 583 F. App'x 18, 20 (2d Cir. 2014) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)); *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). "[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846 (internal quotation marks omitted).

The DMV does not dispute that Morgan's filing a complaint with the CHRO on September 19, 2016 constituted "protected activity" under Title VII, and it admits that it knew about her CHRO complaint by at least November 14, 2016, when it filed a written response. The DMV also does not dispute that Morgan's termination in April 2017 was an "adverse employment action." As to the remaining issue, causation, I assume without deciding that Morgan has established a prima facie case, and so the burden shifts to the DMV at the second step. The DMV has offered ample evidence of a legitimate, non-discriminatory basis for Morgan's termination, pointing to three incidents of allegedly "poor judgment," including an admitted failure to follow policy regarding vehicle pursuits, all between February and July, 2016. *See* ECF No. 43-8. Because the DMV has offered these legitimate reasons, the burden shifts back to Morgan at the third step to "demonstrate that the [DMV's] proffered reason is pretext for retaliation," and that her CHRO complaint "was a but-for cause" of her termination. *Kleehammer*, 583 F. at 20.

The issue in this case, therefore, is whether Morgan has created a genuine dispute of material fact about whether her CHRO complaint was a but-for cause of her termination. In Title VII retaliation cases, causation can be shown either directly, "through evidence of retaliatory

13

animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct . . . ." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Zann Kwan*, 737 F.3d at 846 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."). As discussed below, I find that Morgan has not adduced sufficient direct or circumstantial evidence to permit a reasonable juror to find that retaliatory motive was a but-for cause of her termination.

## A.  <u>Direct Evidence of Retaliatory Motive</u>

Morgan has not pointed to any direct evidence of retaliatory animus. She testified at her deposition that "no one at DMV ever said anything to her about having filed her CHRO complaint." Def. Stmt., ECF No. 43-2 ¶ 90. And she points to no other evidence that the DMV was unreceptive to such complaints, retaliated against any other employees who engaged in "protected activity" under Title VII, or made any comments to her suggesting that they viewed such complaints unfavorably. Nor does she point to any evidence that her CHRO complaint affected HR's investigation.

## B.  <u>Circumstantial Evidence of Retaliatory Motive</u>

Morgan argues that disparate treatment, an unconvincing explanation from the DMV, and temporal proximity all suggest that her CHRO complaint was a but-for cause of the DMV's decision to terminate her.

### 1. *Disparate Treatment and Pretext*

Morgan argues that "[s]he is the only Inspector ever terminated for such activity [*i.e.*, the three incidents] in the known history of the Department of Motor Vehicles," that the DMV's proffered reasons for firing her were false, and that the DMV's decision to terminate her therefore "plainly cannot be justified as legitimate." ECF No. 46 at 2, 5. In making these arguments, Morgan relies on the affidavit submitted by Lt. Green, ECF No. 46-2, which opines on Morgan's conduct in each of the three incidents, and on the arbitration ruling submitted along with her supplemental opposition brief, ECF No. 50-1. Morgan does not refer to any other exhibits in her summary judgment papers.

#### a. Lt. Green Affidavit

Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit . . . used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." In his affidavit, Lt. Green sets forth his background as the officer charged with responsibility for supervising officer training at the DMV and avers that he is "personally familiar with the disciplinary proceedings brought against Officer Alicia Morgan." ECF No. 46-2 ¶ 3. Specifically, he "personally examined Officer Morgan" regarding the issue that arose in her firearms training and "determined that there was no irregularity in the manner in which she handled that issue." *Id.* ¶ 4. His affidavit also states, with regard to the vehicle pursuit, that he "determined that [Morgan] had indeed violated our policy" regarding vehicle pursuits. *Id.* And with regard to the traffic stop, it states that he "examined all the details of [the traffic stop] and determined that she did nothing wrong." *Id*. The language of the affidavit does not suggest that it is made on personal knowledge, with the possible exception of the training issue, which was the area Lt. Green supervised and as

to which the affidavit states—albeit somewhat vaguely—that he "personally examined" Morgan. *Id.* This reading comports with Lt. Green's testimony at an unemployment compensation hearing in August 2017 that he has "official knowledge of the training issue," but that his knowledge of the vehicle pursuit and traffic stop "was just hearsay stuff. I haven't got anything official from the department about those two . . . ." ECF No. 52-1 at 26–27; *see also id.* at 28 ("I have no concrete knowledge about the other two incidents, from an agency standpoint. . . . I was never brought into the loop or . . . given any information about those incidents.").[4] Because Lt. Green's affidavit therefore does not establish that he has personal knowledge of two of the three underlying incidents, his opinions on those incidents cannot be considered on summary judgment under Rule 56(c)(4). To the extent Lt. Green was disclosed as an expert (a point the parties do not address in their briefs), the affidavit also does not show that he is "competent" to offer opinions as to whether Morgan violated DMV policy regarding either vehicle pursuits or traffic stops; he lacks personal knowledge of the incidents, and his affidavit does not indicate (except in a cursory fashion) what factual investigation he undertook to form those opinions. Morgan has thus not offered sufficient evidence to allow the Court to find Lt. Green qualified to offer expert

---

[4] The DMV argues that Lt. Green's affidavit conflicts with this prior sworn testimony and so cannot be used to create an issue of material fact at the summary judgment stage. ECF No. 52 at 8–9. But, as the DMV notes in its brief, the "sham issue of fact doctrine" applies to third-party witnesses, including expert witnesses, when the contradictions are "unequivocal," "inescapable," and "unexplained." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014). While Lt. Green's statement in his affidavit that he is "personally familiar with the disciplinary proceedings brought against Officer Alicia Morgan" is vague and perhaps misleading, I do not find that it unequivocally and inescapably contradicts his hearing testimony. His affidavit could be read to mean that he personally reviewed the records of the disciplinary proceedings, which would be consistent with his August 2017 testimony that he did not have "official knowledge" of the vehicle pursuit or traffic stop incidents. In any event, as discussed in the main text, Lt. Green's affidavit does not meet the requirements of Fed. R. Civ. P. 56(c)(4), and even if it did, it would not create a genuine dispute of material fact as to the issue of retaliatory intent.

testimony on those issues. *See* Fed. R. Evid. 702 (requiring parties seeking to offer expert testimony to show, *inter alia*, an adequate factual basis for the expert opinion); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (noting that the proponent of expert testimony "has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," and that the court must act as a "gatekeeper," ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (citing *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993))).[5]

When ambiguities are resolved in the plaintiff's favor, Lt. Green's affidavit attests to the following points based on his personal knowledge: (1) that "there was no irregularity in" Morgan's conduct in her firearms training, (2) that there was "a white male officer who violated [the vehicle pursuit] policy and, after an investigation determined that he had violated the policy, he received no discipline whatsoever," and (3) that Morgan, a black female, "is the only person ever terminated from a position as a sworn officer with the Department of Motor Vehicles for the sort of offenses that were charged against her." ECF No. 46-2 ¶¶ 4–6. None of these statements raises an inference of retaliation.

Lt. Green's averment that, in his view, there was "no irregularity" in Morgan's handling of the firearms training does not show pretext because, even when construed in the light most

---

[5] Even if I were to consider Lt. Green's opinions on the vehicle pursuit and traffic stop incidents, these opinions are not probative of whether the DMV acted with retaliatory intent. He opines that she did violate the vehicle pursuit policy but avers that Morgan "did nothing wrong" in the traffic stop. As noted below, even if I credited this opinion, it would not suggest that the DMV's own finding that Morgan demonstrated "poor judg[]ment" during the traffic stop was not honestly believed or otherwise pretextual. Further, Lt. Green's affidavit makes no mention of Morgan's CHRO complaint but opines, instead, that Morgan "was subjected to disparate treatment based on her race, color, and gender." ECF No. 46-2 ¶ 7. But I previously dismissed Morgan's hostile work environment claim based on race, Morgan abandoned any other racial discrimination claim, and she has made no claim of gender discrimination.

favorable to the plaintiff, it does not suggest that the DMV was lying about its belief that Morgan "utilized poor judg[]ment in the comments that she made during the training," ECF No. 43-8 at 12, or that that statement otherwise masked retaliatory animus. Even if Lt. Green's opinion is a more correct assessment of the incident based on the DMV's standards of conduct, and even if the DMV's assessment was based on an erroneous but good-faith decision to credit the three inspectors' version of events over Morgan's, that would not suggest that the DMV was actually motivated by retaliatory intent. *Maynard v. Stonington Cmty. Ctr.*, No. 3:15-CV-483 (RNC), 2018 WL 1633709, at *5 (D. Conn. Mar. 31, 2018) ("As long as an employer has a good faith belief that an employee engaged in misconduct, the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." (internal quotation marks omitted)); *see also McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("[W]e are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue." (internal citations omitted; emphasis in original)).

As to Lt. Green's averments regarding disparate treatment, he does not identify an appropriate comparator. "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment . . . the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). Material similarities include "(1) whether the plaintiff and [her comparators] were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was

of comparable seriousness." *Id.* at 40. Morgan has not shown that she was similarly situated in all material respects to any other DMV employees.

Lt. Green states that a "white male officer who violated that [vehicle pursuit] policy . . . received no discipline whatsoever," but he does not offer any details of that other officer's pursuit. The record contains evidence of two other vehicle pursuits by male DMV officers: one by Lt. Bridge, a white male, on November 27, 2012 and one by Inspector Melendez on May 6, 2015. Def. Stmt., ECF No. 43-2 ¶¶ 53–54, 59. The DMV found that Inspector Melendez's pursuit did not violate policy, and so he is not an appropriate comparator. *Id.* ¶ 61. At the time of Lt. Bridge's pursuit in November 2012, the DMV had a "no pursuit policy," *id.* ¶¶ 56–57, and so he and Morgan were not "subject to the same performance evaluation and discipline standards." *Graham*, 230 F.3d at 40.[6] While Lt. Bridge's 2012 pursuit "was technically a violation of DMV's no pursuit policy," Division Chief Rio "determined that [the pursuit] was an appropriate violation based on the exigent circumstances," since the pursuit was both requested and acknowledged by the State Police. *Id.* ¶ 56; Rio Aff., ECF No. 43-9 ¶¶ 13–14. Lt. Bridge's pursuit was notably different than Morgan's pursuit: while he engaged in a pursuit of only "approximately 2.75 miles" while maintaining communication with State Police, Def. Stmt.,

---

[6] In her Local Rule 56(a)(2) statement, Morgan denies the DMV's statement—which is supported by DMV Division Chief James Rio's affidavit, ECF No. 43-9 ¶ 25—that "[t]he plaintiff is the only Motor Vehicle Inspector who failed to adhere to the standards set forth in the Uniform Statewide Pursuit Policy in engaging in a pursuit." Def. Stmt., ECF No. 43-2 ¶ 64. Morgan's denial states that "the policy applicable to Lt. Bridge was comparable to the policy used against the plaintiff in all relevant aspects," ECF No. 46-1 ¶ 64, but this statement is not followed by any citation to evidence in the record. Because Morgan "fails to properly support [this] assertion of fact," I consider the DMV's statement that Morgan "is the only Motor Vehicle Inspector who failed to adhere to the standards set forth in the Uniform Statewide Pursuit Policy in engaged in a pursuit" admitted for the purposes of this motion. *See* D. Conn. Local Civ. R. 56(a)(3); Fed. R. Civ. P. 56(e)(2). Finally, to the extent that Morgan is making a legal argument that a policy that prohibits all pursuits is "comparable . . . in all relevant aspects" to one that allows pursuits as long as the State Police are notified, she is plainly incorrect.

ECF No. 43-2 54, Morgan engaged in a pursuit of "at least 16 miles" that "lasted more than 10 minutes with speeds ranging form 80-120 mph," and she failed to notify State Police upon initiating the pursuit, *id.* ¶¶ 44–46. Morgan has not shown, therefore, that the two pursuits were of "comparable seriousness." *Graham*, 230 F.3d at 40. Moreover, the DMV disciplined Morgan after three incidents of "poor judgment" between February and July 2016; there is no evidence that Lt. Bridge was investigated for any incidents aside from the pursuit in November 2012. Based on these facts, Morgan has not shown that Lt. Bridge was "similarly situated in all material respects." *Graham*, 230 F.3d at 39. Thus, the DMV's decision to discipline Morgan but not Lt. Bridge does not raise an inference of retaliatory motive against Morgan.

In his affidavit, Lt. Green also states that Morgan is the "only person ever terminated from a position . . . for the sort of offenses that were charged against her." ECF No. 46-2 ¶ 6. This statement does not show disparate treatment—let alone raise an inference of retaliatory motive—because it does not show whether any other DMV officer ever engaged in all three of the "sort of offenses that were charged against [Morgan]." Because neither Lt. Green's nor Morgan's testimony identifies a similarly situated comparator who was not terminated, she has not raised a genuine dispute of material fact regarding disparate treatment that would permit an inference of retaliatory motive.[7]

### b. Arbitration Ruling

With her "supplemental" opposition brief, Morgan submitted a ruling by a labor arbitrator on the grievance proceeding Morgan's union brought on her behalf after her

---

[7] In her deposition, Morgan also testified that Lt. Bridge violated the DMV's pursuit policy but was not terminated. Def. Stmt., ECF No. 43-2 ¶ 50. But she admitted that her knowledge of Lt. Bridge's pursuit was based on hearsay. *Id.* ¶¶ 50–51; Morgan Dep., ECF No. 43-4 at 54–58. Therefore, neither she nor Lt. Green has shown that Lt. Bridge was "similarly situated in all material respects."

termination. The ruling, issued on June 26, 2019, found that her termination was "without just cause." ECF No. 50 at 1. She offers the exhibit without argument, simply stating that it "may be relevant to the court's consideration." *Id.* Even assuming that I may consider this ruling for the truth of the matters stated therein, *see* Fed. R. Evid. 803, I agree with the DMV that it fails to raise a factual issue as to Morgan's retaliation claim. ECF No. 52 at 11.

The issue in the case before me is not whether the DMV's decision to terminate Morgan was correct or fair or supported by "just cause," but whether it was caused by her filing of the CHRO complaint. *See Maynard*, 2018 WL 1633709, at *5 ("As long as an employer has a good faith belief that an employee engaged in misconduct, the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." (internal quotation marks omitted)); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."); *Martinez v. Connecticut*, No. 3:13-CV-00457 (JAM), 2016 WL 730690, at *3 (D. Conn. Feb. 23, 2016) ("Absent some evidence—direct or indirect—of discrimination, the fact that an employer may wrongfully terminate an employee on the basis of facts that are later determined not to be true does not by itself suffice to create a genuine issue of fact of discrimination."). A lack of "just cause" under a collective bargaining agreement, by itself, is "legally insufficient" to show that a defendant's reasons for terminating a plaintiff "were pretexts for unlawful discrimination." *Martinez*, 2016 WL 730690, at *3.

The arbitration ruling offered in this case, therefore, does not create any factual issue regarding retaliatory intent. While the arbitrator found that the incidents did not "warrant termination when combined months after they occurred," the ruling makes no mention of

Morgan's CHRO complaint or any evidence of retaliatory motive. ECF No. 50-1 at 23. The ruling does not suggest that the DMV treated Morgan differently than other employees in conducting its investigation, and it does not suggest that the DMV was lying when presenting its explanation for terminating Morgan. *See id.* at 27–28. While the arbitrator found that the DMV's arguments for firing Morgan were not "compelling," *id.* at 27, that the DMV's argument that it could not have imposed lesser discipline was "weak," *id.* at 28, and that its claim that Morgan had placed it in a "precarious position" was an "overstatement of reality," *id.*, the arbitrator agreed that, with respect to the traffic stop, Morgan should not have made the "ill[-]advised" comment that "this is why you people get in trouble with the police," *id.* at 26, and that Morgan "did not fulfill the[] requirements" of the DMV pursuit policy, *id.* at 24.[8] *See also Martinez*, 2016 WL 730690, at *3 ("[T]he fact that an employer's reason for discharge . . . is honestly described but poorly founded is not a pretext . . . unless plaintiff can point to facts suggesting that the company investigated her differently because of reasons of discrimination" (internal quotation marks omitted)). Because Morgan has not pointed to any other facts suggesting retaliatory intent, the arbitrator's ruling by itself does not raise any inference of such intent.

---

[8] Morgan has not argued that any aspect of the arbitration ruling constitutes evidence of pretext, and it is not my role to parse the ruling on my own for signs that the arbitrator might have harbored doubts about the sincerity of the DMV's reasons for terminating Morgan. Nonetheless, to the extent Morgan later argues that the arbitrator's observation that "the State offered no explanation for taking no action at the time of the alleged violations," ECF No. 50-1 at 28, is suggestive of pretext, I note that the undisputed evidence in the record before me does not support such an observation. Morgan admits that she was placed on a period of administrative leave the day after the traffic stop incident—and about a month after the pursuit incident—and that "[e]mployees are placed on administrative leave with pay pending the investigation of conduct the substantiation of which may warrant dismissal." Def. Stmt., ECF No. 43-2 ¶¶ 77–78. The arbitrator makes no mention of Morgan's immediate placement on administrative leave after the traffic stop incident, and it is unclear whether she was aware of it.

### 2. *Temporal Proximity*

In her opposition brief, Morgan also argues that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," ECF No. 46 at 3 (quoting *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001)), and she cites cases finding a causal connection between events up to 13 months apart. *See, e.g.*, *Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 240 (D. Conn. 2006) (finding that a 13-month gap, while "substantial," "is not too temporally disconnected to support an inference of retaliation" in a state-law retaliatory discharge claim). Though her brief does not say so explicitly, she implies that her termination in April 2017 is "not too temporally disconnected" from her CHRO complaint filed on September 19, 2016—*i.e.*, that the timing creates an inference of causation. The DMV, on the other hand, points to other cases holding that gaps of even two or three months may be insufficient to support an inference of causation. ECF No. 43-1 at 8.

In the Second Circuit, there is no bright line rule on the issue of temporal proximity in retaliation cases: some cases hold that a two-month gap, without other evidence of retaliatory intent, does not establish causation, *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009), while others have found that "the passage of only six months . . . is sufficient to support an inference of causal connection," *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). In *Espinal*, the Court explained that the lack of a "bright line" rule in this area "allow[s] our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." 558 F.3d at 129.

The facts of this case distinguish it from other Second Circuit cases finding an inference of causation despite a several months-long gap. For instance, the plaintiff in *Espinal* brought a

retaliation claim under § 1983, alleging an assault by correctional officers in retaliation for filing previous lawsuits. 558 F.3d at 120–21. Based on the particular facts of that case, the Court found that the "passage of only six months" was sufficient to support an inference of causation because the defendant-officers plausibly "waited to exact their retaliation at an opportune time—as when [the plaintiff] was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by [the plaintiff]." *Id.* at 129; *see also Bernhardt v. Interbank of New York*, No. 92 CV 4550, 2009 WL 255992, at *6 (E.D.N.Y. Feb. 3, 2009) ("While [an 11-month] passage of time would suggest strongly the absence of a causal link, such an inference is not, at this point, compelled by the available evidence such that the Court could resolve this claim as a matter of law. When the plaintiff [engaged in protected activity] the Bank was in the critical start-up phase. Retaliatory action against the plaintiff at that time might have seriously jeopardized the viability of the fledgling institution."). Morgan offers no tactical reason the DMV might have had for delaying her termination, and, unlike in other cases where long delays were still found to support causation, she cites no other evidence suggestive of retaliatory intent.

In *Dupee v. Klaff's, Inc.*, the court found an "inference of retaliation" despite a "13-month gap," but the plaintiff in that case presented "other evidence of retaliation, such as evidence that defendant's workers compensation insurance rates . . . went up 19% as a result of plaintiff's claim, . . . and . . . direct evidence of retaliatory animus." 462 F. Supp. 2d at 240. That plaintiff also showed "other adverse conduct taken against him [in the 13-month period], including ridicule and harassment." *Id.* at 241; *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46–47 (2d Cir. 1980) (in case involving an 8-month gap, finding that the defendant failed "to show some legitimate non-discriminatory reason for its actions," citing evidence showing "transparent pretexts for retaliation," disparate treatment of the plaintiffs, and the defendant's

"unacceptable" explanation that the adverse action against plaintiffs was due to "inadvertence and oversight"). Morgan has presented no such additional evidence here. Therefore, while the Second Circuit has at times found evidence of causation despite gaps of several months between the protected activity and the adverse action, those cases involved either a factual context making the defendant's delay in retaliating plausible or additional evidence of causation. Neither is present in this case.

To the contrary, the sequence of events in this case militates against an inference of causation. Morgan was placed on administrative leave on July 27, 2016, and a disciplinary hearing was held on September 16, 2016—all before she filed her CHRO complaint on September 19, 2016. And Morgan admits that "[e]mployees are placed on administrative leave with pay pending the investigation of conduct the substantiation of which may warrant dismissal." Def. Stmt., ECF No. 43-2 ¶ 78. So she was aware by July 27, 2016, that she was facing potential discipline, including dismissal. This evidence of an ongoing disciplinary process, beginning before the plaintiff's protected activity, undermines her claim that the protected activity was a but-for cause of her termination. As the DMV notes in its brief, several cases in this Circuit have rejected an inference of causation where the adverse action process began before the plaintiff engaged in protected activity. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (finding no causal connection when the defendant "was contemplating [the adverse action] before it learned of the [plaintiff's] suit," since "[the defendant's] proceeding

along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

Morgan argues that the fact that her disciplinary hearing occurred before she filed her CHRO complaint does not undercut an inference of retaliation because "Lt. Garfield [Green] testified at the disciplinary hearing" and opined that plaintiff was "not in violation of its procedures in two of the three instances alleged against her and that any proposed discipline for the one remaining violation would be grossly disproportionate to the nature of the offense viewed in the light of the department's past practices." ECF No. 46 at 4. The DMV's decision "to terminate the plaintiff in the face of that extraordinary evidence," she argues, "plainly cannot be justified as legitimate." *Id.* at 4–5. Morgan seems to argue, in other words, that the HR investigation would have come out a different way had the DMV heeded Lt. Green's testimony instead of acting on a retaliatory motive. But this argument falls short for two reasons. First, although she asserts it in her brief, Morgan has not adduced any evidence suggesting that Lt. Green testified at her disciplinary hearing on September 16, 2016; the DMV, on the other hand, offers evidence that Lt. Green testified only at an unemployment compensation hearing in August 2017 and an arbitration hearing in September 2018, both of which were after Morgan's termination in April 2017. Callahan Supp. Aff., ECF No. 52-1 at 3; ECF No. 52-1 at 24–29 (transcript of Lt. Green's testimony at an unemployment benefits hearing). Therefore, Morgan has not offered evidence that the DMV decided to terminate her in spite of any opinions from Lt. Green. Second, as discussed above, Lt. Green's affidavit, ECF No. 46-2, does not suggest that DMV had a retaliatory motive for terminating Morgan. Even if Lt. Green had given testimony at the disciplinary hearing consistent with his affidavit, that would not have made it significantly more likely that the HR investigation would have been resolved favorably to Morgan, especially

because he lacked personal knowledge as to two of the three incidents, including the admitted violation of the pursuit policy.

Morgan has not pointed to any other flaws in the HR investigation, initiated in July 2016 when Morgan was placed on administrative leave. There is nothing in the record, therefore, to suggest that the investigation would have come out differently but for Morgan's September 19, 2016 complaint. Because the DMV had already begun the disciplinary process against Morgan before she filed her CHRO complaint, because her eventual termination came seven months after her protected activity (or, at best for Morgan, five months after the DMV was aware of the CHRO complaint), because the factual context of this case does not suggest that the DMV intentionally delayed its termination decision, and because there is no other evidence—direct or indirect—of retaliatory animus, I find that the temporal connection is too attenuated to support an inference of causation between Morgan's protected activity and her termination.

* * *

Morgan has not submitted evidence sufficient to create a jury question as to whether retaliation was a but-for cause of her termination. Summary judgment is therefore warranted.

## IV.   MOTION TO SEAL EXHIBITS

The DMV also moved to file certain exhibits under seal, since the documents contain "identifying information regarding state police troopers and DMV Motor Vehicle Inspectors, including badge numbers, and information pertaining to a law enforcement motor vehicle stop; specifically, the identity of the motorist and passenger involved, who were not charged." ECF No. 44. The DMV filed redacted versions of these exhibits on the public docket. *See* ECF Nos. 43-5 through 43-9.

Judicial records carry a "presumption of openness," one that is rebuttable upon a showing that sealing the record will preserve high values and is narrowly tailored to serve that interest. *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004); D. Conn. Local Civ. R. 5(e)(3). The DMV has not identified any "clear and compelling reasons" for sealing the badge numbers or names of adults identified in these exhibits. L.R. 5(e)(3). Therefore, the motion to seal is denied, and the Clerk is directed to unseal the unredacted exhibits, ECF Nos. 45 & 45-1.

## V.     CONCLUSION

For the reasons set forth above, the DMV's motion for summary judgment, ECF No. 43, is GRANTED. The motion to file an oversized reply brief, ECF No. 51, is GRANTED. The motion to seal exhibits, ECF No. 44, is DENIED, and the Clerk is directed to unseal the unredacted exhibits, ECF Nos. 45 & 45-1.

IT IS SO ORDERED.

Dated:          Hartford, Connecticut          _____/s/_____
                March 20, 2020                 Michael P. Shea, U.S.D.J.